THE HONORABLE RICHARD A. JONES

1

2

3

4

5

6

7

8      UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF WASHINGTON
9

10  ORGANO GOLD INT'L, INC. a Washington
    corporation,                              NO. 2:16-CV-00487
11
                                              **DECLARATION OF JAMES
12                   Plaintiff,               BULTHUIS IN SUPPORT OF
                                              PLAINTIFF'S REPLY**
13          v.

14  LUIS VENTURA, an individual, LUZ ANGELA
    VENTURA, an individual; and L&A
15  VENTURA MANAGEMENT, INC., a Texas
    corporation,
16
                     Defendants.
17

18          I, James Bulthuis, declare:

19          1.      I am one of the counsel for Plaintiff Organo Gold in the above-captioned matter.

20  I am over the age of eighteen years and am otherwise competent to testify and make the

21  following statements based upon my personal first-hand knowledge.

22
            2.      Attached hereto as Exhibit 11 is the Supplemental Declaration of Norm Perrett.
23
    My office received this declaration today, April 15th.  The document was scanned and sent to
24
    Mr. Perrett before he signed.  Consequently, the first two pages are a clean version of his
25
    declaration, and the third page is his signature.
26

**DECLARATION OF JAMES BULTHUIS IN SUPPORT OF
PLAINTIFF'S REPLY- 1**     <5881.004/317839>

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1    3.    Attached hereto as Exhibit 12 is the Supplemental Declaration of Joselyn Hip

2  Zelaya.

3    4.    Attached hereto as Exhibit 13 is the Declaration of Dominga Herrera.  My office

4  received this declaration today, April 15th.  The document was scanned and sent to Mr. Herrera

5  before he e-signed.  Consequently, the first three pages are a clean version of his declaration,

6  and the fourth page is his e-signature.

7    I declare under penalty of perjury under the laws of the State of Washington that the

8  foregoing is true and correct.

9

10    DATED this 15th day of April, 2016, in Seattle, Washington.

11

12                                By: s/ James Bulthuis
                                     James Bulthuis, WSBA #44089

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**DECLARATION OF JAMES BULTHUIS IN SUPPORT OF
PLAINTIFF'S REPLY- 2**    <5881.004/317839>

TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

# Exhibit 11

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ORGANO GOLD INT'L, INC., a Nevada corporation, <br><br> Plaintiff, <br><br> v. <br><br> LUIS VENTURA, an individual, LUZ ANGELA VENTURA, and individual; and L&A VENTURA MANAGEMENT, INC., a Texas Corporation. <br><br> Defendants. | NO. _____ |

## SUPPLEMENTAL DECLARATION OF NORM PERRETT

I, Norm Perrett, having previously made a formal Declaration in this proceeding on 28 March, 2016 (the "First Declaration"), do hereby supplement that Declaration as follows:

1.    I have read the Defendant's Opposition to Motion for Temporary Restraining Order and Preliminary Injunction, and Motion to Strike evidence in Support of Motion (the "Defendant's Brief"), filed April 14, 2016.

2.    Organo is, by agreement, part of a multinational direct-sales enterprise consisting of 47 different independent entities, which permit the sale of Organo Gold branded product in 46 different countries.  Organo's total Distributor base is accurately described in my First Declaration, and the effects on that Distributor base by the actions

of the Defendant Luis Ventura, is accurately described in my First Declaration and the Declarations of Ms. Joselyn Hip Zelaya.

3.      The total numbers of Organo Distributors presented in the Defendant's Brief is misleading, in that (a) it does not distinguish between total number of "Organo Gold" Distributors worldwide amongst all the different entities with the authority to confer individual licenses and actual Organo (USA) Distributors, and, (b) it does not distinguish between "Active" Distributors and "Historical" Distributors of Organo.

4.      Each Distributor acquires a one year license from the Organo Gold entity operating in a particular jurisdiction, a license to sell Organo Gold branded products in that particular jurisdiction (Country).  The licence can be renewed each year upon the payment of a Renewal Fee provided that the Distributor's status is otherwise in good standing.

5.      In 2009, Organo had a previous set of Policies and Procedures in place, which applied to Defendant Luis Ventura when he first applied to be a Distributor. Attached hereto as Exhibit B is a true and correct copy of those P&Ps.

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this 15th day of April, 2016, at Vancouver, British Columbia, Canada


_____
Norm Perrett

of the Defendant Luis Ventura, is accurately described in my First Declaration and the Declarations of Ms. Joselyn Hip Zelaya.

3.      The total numbers of Organo Distributors presented in the Defendant's Brief is misleading, in that (a) it does not distinguish between total number of "Organo Gold" Distributors worldwide amongst all the different entities with the authority to confer individual licenses and actual Organo (USA) Distributors, and, (b) it does not distinguish between "Active" Distributors and "Historical" Distributors of Organo.

4.      Each Distributor acquires a one year license from the Organo Gold entity operating in a particular jurisdiction, a license to sell Organo Gold branded products in that particular jurisdiction (Country).  The licence can be renewed each year upon the payment of a Renewal Fee provided that the Distributor's status is otherwise in good standing.

5.      In 2009, Organo had a previous set of Policies and Procedures in place, which applied to Defendant Luis Ventura when he first applied to be a Distributor. Attached hereto as Exhibit B is a true and correct copy of those P&Ps.

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this 15th day of April, 2016, at Vancouver, British Columbia, Canada

Norm Perrett

# Exhibit B



# Organo Gold
# Policies & Procedures
# - United States -

## Organo Gold Representative Policies & Procedures - USA

I.      INTRODUCTION ...................................................................................................4

II.     CODE OF CONDUCT ..............................................................................................4

III.    COMPANY OBLIGATIONS .......................................................................................4

IV.     REPRESENTATIVE OBLIGATIONS ...........................................................................5

V.      DEFINITIONS .......................................................................................................5

VI.     REPRESENTATIVE STATUS .....................................................................................6

    A)    INDEPENDENT STATUS: ......................................................................................6
    B)    APPLICATION REQUIREMENTS: ...........................................................................7
    C)    APPLICATION PROCESSING: .................................................................................7
    D)    FALSIFIED REGISTRATION: ...................................................................................7
    E)    REPRESENTATIVE IDENTIFICATION: ......................................................................7
    F)    DOING BUSINESS AS AN ENTITY (DBA): ................................................................7
    G)    MULTIPLE REPRESENTATIVE ENTITIES: .................................................................8
    H)    REPRESENTATIVE STATUS DURATION: ...................................................................8
    I)    CHANGES IN SPONSORSHIP: .................................................................................8
    J)    SALE OR TRANSFER OF REPRESENTATIVE STATUS: ..................................................8
    K)    DIVORCE: ..........................................................................................................8
    L)    BENEFICIARIES: ..................................................................................................9
    M)    SPONSORING RIGHTS AND RESPONSIBILITIES: .......................................................9
    N)    INTERNATIONAL REPRESENTATIVE STATUS: ...........................................................9
    O)    NEW MARKET DEVELOPMENT: ............................................................................9
    P)    ORPHANS: .........................................................................................................9
    Q)    YEARLY ACCOUNT ADMINISTRATION FEES: ..........................................................10
    R)    VOLUNTARY CANCELLATION: ..............................................................................10
    S)    INVOLUNTARY TERMINATION: ............................................................................10

VII.    COMPANY PRODUCTS & SERVICES ........................................................................10

    A)    ORDERING: .....................................................................................................10
    B)    AUTOSHIP: ......................................................................................................11
    C)    PREFERRED CUSTOMER E-COMMERCE PROGRAM: .................................................11
    D)    NON-PAYMENT: ...............................................................................................11
    E)    REPRESENTATIVE/COMPANY EMPLOYEE RELATIONS: .............................................11
    F)    SHIPPING AND HANDLING: .................................................................................12
    G)    OUT OF STOCK ITEMS: ......................................................................................12
    H)    REPRESENTATIVE PRODUCT EXCHANGES: .............................................................12
    I)    REFUND POLICY: ..............................................................................................13
    J)    REPRESENTATIVE RETAIL SALES: .........................................................................13
    K)    PRODUCT LIABILITY: ..........................................................................................13

VIII.   COMPENSATION .................................................................................................13

    B)    QUALIFICATIONS & ACCOUNTING FEES: ..............................................................14
    C)    COMMISSION CHECK FEES: ................................................................................14

IX.     RESTRICTIONS ...................................................................................................14

    B)    REPRESENTATIONS: REPRESENTATIVES ................................................................14
    C)    ADVERTISING: ..................................................................................................14

D)   Internet Advertising: ............................................................................................................... 15

E)   Spamming: ................................................................................................................................ 16

F)   Media Inquiries: ....................................................................................................................... 17

G)   Trademark, Proprietary Information, and Trade Secrets: ........................................................ 17

X.    NON COMPETITION AGREEMENT ................................................................................................. 18

XI.   DISCIPLINARY MEASURES .............................................................................................................. 18

XII.  FOREIGN TRANSLATIONS ............................................................................................................... 18

XIII. PRIVACY STATEMENT ..................................................................................................................... 18

XIV.  INDEMNITY ...................................................................................................................................... 19

XV.   STATUTORY PRECEDENCE ............................................................................................................. 19

XVI.  PROGRAM MODIFICATIONS ........................................................................................................... 19

XVII. NON-WAIVER PROVISION .............................................................................................................. 19

XVIII.POLICY ENFORCEMENT .................................................................................................................. 19

XIX.  ARBITRATION ................................................................................................................................... 19

XX.   GOVERNING LAW, JURSIDITION & VENUE .................................................................................. 19

XXI.  CONTACT INFORMATION ............................................................................................................... 20

## I. INTRODUCTION

Welcome to the world of Organo Gold.

Congratulations on taking the first step in a journey that could very well change your life. Though simple, the road ahead will not be an easy one. Your success as an Organo Gold Representative will be directly related to the quality of your relationship with your customers, sponsored Representatives and Organo Gold (hereinafter the Company). A clear statement of our Policy & Procedures (P&P) promotes harmony in these vital relationships and ensures that equality of opportunity and fairness is available to everyone who comes to the table.

As an Independent Representative, you agree to follow the spirit as well as the letter of the P&P. You will find that adhering to the P&P will assist you in providing quality and genuine service, which in turn will lead to greater success and rewards.

The Company's P&P constitutes part of the Independent Representative Application and Agreement and they, when accepted by the Company, together with the Organo Gold Compensation Plan and any other document incorporated by reference, form the Agreement between the Independent Representative and the Company.  The purpose of the Agreement is to authorize an individual to be an Independent Representative of the Company and set forth the respective duties, responsibilities and obligations of all parties. You confirm this agreement each and every time you cash an Organo Gold bonus check.  It is with great anticipation of your success that we present you this P&P and urge you to follow it closely and completely.

## II. CODE OF CONDUCT

First and foremost, Organo Gold is built on a foundation of integrity, edification and trust. Whether dealing with your customers, fellow Representatives or the Company, you should always give and expect to receive all of the above. All activities will be measured against this yardstick – the P&P is but a guideline; when combined with common sense and camaraderie a powerful synergy will develop. Anything that detracts from this should be dealt with immediately, first through your upline organization, then to the Company if necessary. Destruction of this foundation will not be tolerated.

Application to become an Independent Representative of the Company requires that the applicant agree to conduct business according to the following Code of Conduct.  This code ensures high standards of integrity and professionalism throughout the Company's network of Independent Representatives and protects the Company's overall business image.

## III. COMPANY OBLIGATIONS

Representatives have a right to expect the Company to operate in accordance with the laws and practices that govern business in general as well as the network marketing industry in particular. The fiduciary relationship of trust between Representatives and the Company is fragile and the Company, as the primary steward of that relationship, has an obligation to be fair and equitable to all.

A)   The Company will:

    1)   Conduct itself in an ethical and professional manner;
    2)   Process orders and ship products in a timely fashion;
    3)   Provide Representatives with the organization and volume information required to manage business activities;
    4)   Compensate Representatives in accordance with the approved compensation plan;
    5)   Comply with all laws governing the sale and distribution of products and the compensation of participants;
    6)   Administer its policy fairly, without prejudice or favor, to protect the interest of all Representatives;
    7)   Provide liability insurance on its products when used in accordance with the instructions on the label.

B)   The Company will not:

    1)   Guarantee success;
    2)   Provide any commissions for the recruitment of others;
    3)   Tolerate Representatives pressuring prospects into purchasing large quantities of inventory;
    4)   Allow misleading product claims to be made in any form;
    5)   Tolerate Representatives "stocking-up" on products merely to obtain commissions;
    6)   Advise Representatives on meeting compensation qualifications;
    7)   Terminate or suspend Representatives without due process;
    8)   Represent that there is any substitute for hard work.

## IV.  REPRESENTATIVE OBLIGATIONS

A)  Representatives will:

1)  Conduct their business in an ethical and professional manner;
2)  Make it clear that success in the Company's compensation program is based on retail sales rather than recruiting;
3)  Represent the compensation plan as specified by the Company;
4)  Comply with applicable consumer protection laws and regulations;
5)  Provide bona fide training, motivation and support to Representatives in their organization.

B)  Representatives will not:

1)  Engage in deceptive, unlawful, or unethical business or recruiting practices (Crossline recruiting);
2)  Engage in high pressure selling or recruiting practices;
3)  Make misleading sales claims or guarantees concerning the Company or its products;
4)  Sponsor or enroll minors or persons who are not capable of making an informed decision;
5)  **Conduct business activities in countries other than those approved by the Company;**
6)  Disparage, demean, or make negative remarks about the Company, its Representatives, products, Compensation Plan, officers, directors, or employees;
7)  Seek in any way to violate or circumvent Company policy, whether in spirit or deed.

## V.  DEFINITIONS

All Independent Representatives will better understand Company policy by understanding the basic terms commonly used in Company literature, the P&P and/or public presentations.

A)  **Active**:  A Representative is considered active when they generate 50 PV in personal product business volume in the current or previous four (4) commission weeks.

B)  **AutoShip**: A predetermined order processed systematically, on a periodic basis, using an approved payment method on file with the Company. In some countries, an Autoship order is not required to be eligible to participate in the Organo Gold Compensation Plan.

C)  **Bonus Volume (BV)** – Sales volume generated from all first sales orders made by a Representative and all Pack orders. In many instances, these may be one-in-the same. Said volume is placed in the dual team compensation structure for weekly payout. This volume does not contribute to any compensation under the Unilevel compensation structure.
    **Important**: this volume is a universal value. In other words, 10 BV is the same value irrespective of the country or currency sold. After commission calculations are complete, the BV will be converted into the Representative's home market currency for payment.

D)  **Commission Period**:  The time frame used to calculate commissions, both weekly and monthly.
1)  Weekly Commission Period – defined as Monday @ 12:00 a.m. (midnight) to Sunday @ 11:59:59 p.m., **United States Pacific Time, taking into account Daylight Savings Time**. Therefore, the deadline for weekly commissions may vary by an hour in areas not observing Daylight Savings Time. Notice of a time change will be given in the Representatives' back office, as well as in corporate communication.
2)  Monthly Commission Period – defined by calendar month from midnight of the first (1st) through 11:59:59 p.m. of the last day of the month, **United States Pacific Time, taking into account Daylight Savings Time**. Therefore, the deadline for monthly commissions may vary by an hour in areas not observing Daylight Savings Time. Notice of a time change will be given in the Representatives' back office, as well as in corporate communication.

E)  **Commissionable Volume (CV)**: The assigned currency value of each sold product upon which commissions are paid. Sales aids usually have no CV.

F)  **Compression**: For commission calculation purposes only. If a Representative fails to qualify for non-Dual Team commissions by failing to meet the Personal Volume (PV) or Personal Group Volume (PGV) threshold published in the Organo Gold Compensation Plan, any Point Value (PV) generated by the Representative will be compressed up or added to the PV of his Placement Sponsor for that monthly commission period only.  Compression takes place on a monthly basis after rank qualifications have been determined.

G) **DBA**: All Representatives that desire to participate in the Organo Gold Compensation Plan must register by completing "Independent Representative Application Form". In the event that a Representative wishes to operate their Representative Status as a business entity, whether sole proprietor, partnership, corporation, or other form, they must complete a "Representative Doing Business Under Another Name" (DBA) Form and submit it with requisite documentation to Organo Gold for approval. Organo Gold reserves the right to levy a $100.00 fee, including penalties and administrative fees, to any Representative who attempts to register a fictitious entity that is not a bona fide and legal entity meeting United States Revenue regulations.

H) **Downline**: The organization of a Representative, including those who are directly or indirectly sponsored by the Representative and continuing down the lines of sponsorship through infinite levels and legs.

I) **Frontline**: Any first level Representative, whether directly or indirectly sponsored.

J) **Household**: Spouses/Significant others and dependents residing at the same address.

K) **Leg**: A single line of sponsorship starting with a Representative, through their frontline and continuing down through infinite levels.

L) **Monthly Business Report/Sales Recap Statement**: The monthly accounting report provided by the Company which tracks Downline sales activities. This information is also available on the Representative's back office at www.OrganoGold.com.

M) **Paid Rank**: The actual pay-rank a Representative qualifies for in the Organo Gold Compensation Plan during a given commission period. This may or may not equal the pin rank of the Representative (see below)

N) **Pin Rank**: For recognition purposes, the highest rank a Representative ever achieves.

O) **Point Volume (PV)**: The value associated with a product for rank advancement and qualification purposes only. This value is universal and not currency-dependent.
   1) **Personal Point Volume (PPV)**: The PV generated directly by a given Representative, including personal sales and purchases. Retail Customers directly linked to the Representative will also be credited.
   2) **Organizational Point Value (OPV)**: The aggregate PPV of a Representative and that of his/her entire downline organization.

P) **Orphan**: An applicant without a Sponsor.

Q) **Qualified/Eligible**: When a Representative meets the weekly or monthly sales volume and organizational activity required to generate commissions.

R) **Representative**: A person or legal entity currently authorized to purchase products at wholesale prices and participate in the Organo Gold Compensation Plan.

S) **Retail Customer**: Consumers who purchase product for personal use on an occasional or regular basis, but do not participate in the Compensation Plan. They place their product orders through an Active Representative, which is shipped directly from Organo Gold. All sales to Retail Customers, including AutoShip orders, contribute to the PPV of the Representative through whom the orders are placed.

T) **Sponsor**: A Representative who personally enrolls another individual as a Representative.

U) **Upline**: The line of Sponsors that links a Representative to the Company and who, subject to qualifying sales, may earn commissions on that Representative's sales activities.

## VI.  REPRESENTATIVE STATUS

Representative Status does not constitute the sale of a franchise or distributorship. The only purchase requirement to become a Representative is that of a Business Kit, which includes the necessary information for conducting business in an efficient and ethical manner. A person will initially begin their status as an individual. If a Representative desires and meets the requirements listed below, their status may be converted to a bona fide business entity such as a partnership, corporation or cooperative, as outline below.

A)  Independent Status:

1) Representatives are independent contractors.
2) A Representative's decision to enter into this Agreement does not create, nor may the Representative claim that they are, in any way, shape or form, an employer/employee, agency, partnership, franchise, or joint venture relationship between the Company and the Representative.
3) Representatives must abide by all laws, rules and regulations pertaining to the acquisition, receipt, holding, selling, distribution and advertising of Company products and business opportunity.
4) Representatives are solely responsible for declaration and payment of any associated taxes or fees.
5) Representatives are solely responsible for supplying any equipment and tools necessary for operating their Organo Gold business, such as telephone, transportation, professional services, office equipment, and office supplies.
6) Representatives are solely responsible for providing their own place of business and determine their own work hours.

B) Application Requirements:

1) Applicants must be of contractual age (usually 18) and be able to work in their state of residence.
2) Applicants agree to abide by the official Company P&P and warrant that they understand the compensation requirements specified in the Organo Gold Compensation Plan.
3) An applicant that completes an application to become a Representative with the Company agrees to receive electronic emails.
4) Submission of a Social Security Number (SSN) is required. The Company reserves the right to verify the legal presence and right to work of an applicant prior or subsequent to acceptance as a Representative. It is the sole responsibility of the applicant/Representative to ensure that they are functioning within the scope of their presence in the United States.
5) By reference, the terms on the Representative Application and Agreement are incorporated herein and form part of this P&P.

C) Application Processing:

1) The Company reserves the right to accept or reject any applicant and is under no obligation to offer any reason for rejection.
2) The Sponsor and the applicant are solely responsible for the completion of the Independent Organo Gold Representative Application and Agreement. The Company will reject incomplete or faulty applications, and is under no obligation to notify neither the application nor Sponsor of a rejection.
3) If an Application is submitted by fax or through the Internet via an Organo Gold Website Replicating Website or Representative Back Office, an original Application does not have to be submitted. Otherwise, until an original signed Application is received, the Company reserves the right to withhold product orders and/or bonus cheques.

D) Falsified Registration:

1) Submission by a Representative of an Independent Organo Gold Application, along with an Agreement for another individual, without that individual's permission and bona fide signature, is illegal and strictly prohibited.
2) Such registration will result in the termination of the Representative, and may subject the Representative to criminal and/or civil legal consequences.
3) Any person who submits false information in their Application and Agreement will be terminated, and criminal and/or civil legal consequences may result.

E) Representative Identification:

1) A unique Representative Identification Number (ID) will be automatically issued upon enrollment and is to be used for enrolling other Representatives and ordering products.
2) The ID must be referenced in all correspondence with the Company.
3) The Company will assign Preferred Customers a separate and distinguishable Preferred Customer Identification Number (PCID).

F) Doing Business As An Entity (DBA):

1) A Representative status may be converted from an individual to a legal entity, such as a sole proprietorship, partnership, corporation or other form, upon submission by the applicant/Representative and acceptance by the Company of a DBA Form simultaneous with or subsequent to the submission of the Independent Representative Application & Agreement.

2) Non-profit organizations are required to submit, along with the DBA form, proof of their status. Only one Representative entity is allowed per organization; multiple individuals may not enroll on behalf of the organization. As a DBA Representative, it is the organization's responsibility to comply with all tax regulations.

3) By reference, the terms on the DBA Form are incorporated herein and form part of this P&P.

G) Multiple Representative Entities:

1) An individual or household may be part of only one Representative Entity.

2) This includes partial or whole interests in a Representative Status that is a DBA entity.

3) A "household" includes a married or common-law spouse, adult children or others who are listed as dependent for income tax purposes of the Representative.

4) Individual rent-paying tenants, roommates or independent adult children (i.e. not considered a dependent for income tax purposes) are not considered part of the Representative's household and may be enrolled as separate Representatives, but must be placed frontline to the original Representative residing at that address.

H) Representative Status Duration:

1) The term of the Representative Status is one year from the date an Application is accepted by the Company.

2) To remain Active, a Representative must generate a minimum 50 MPV in a single calendar month at least once in a rolling six month period.

3) To be Eligible to be paid in the Company's Compensation Plan, the Representative must meet all monthly and/or weekly qualification requirements.

4) A Representative shall remain eligible to renew their Representative Status so long as he/she remains in compliance with the Company P&P and other rules and regulations.

5) Representatives electing not to renew will be ineligible to reapply for a new position for six months after removal from the system. In the event that the Representative wishes to be reinstated to their original position, they must qualify for their paid rank position; such reinstatement must occur within one month of removal.

6) Representatives that are inactive for a consecutive six (6) month period will be removed from the system and any organization under their Representative Status will be automatically transferred to the Representative's Enrollment Sponsor.

7) The Company reserves the right to remove Representatives from the system that are inactive (no purchases) for a consecutive four (4) month period and any organization under their Representative Status will be automatically transferred to the Representative's Enrollment Sponsor.

I) Changes in Sponsorship:

1) Within the first commissionable month of enrollment, one time only, a Sponsor may elect to transfer a personally enrolled, 1st level new Representative to another Representative, provided:
   (a) the new Representative's volume does not exceed 200 PV.
   (b) the new Sponsor must be within the pay line of the original Sponsor's organization.
   (c) the transfer request must include the written approval of the six (6) direct upline Representatives, and that of the Representative being transferred.
   (d) a written request is submitted and approved. Upon acceptance, the new direct upline of the transferred Representative *permanently* becomes the Sponsor. Timely requests will be accepted, but actual changes will occur only from the 10th to the 22nd calendar day of any month).

J) Sale or Transfer of Representative Status:

1) Representative Status may be sold, transferred or assigned only with prior Company approval, which will not be unreasonably withheld.

2) The Representative agrees to give the Company the first right of refusal to purchase the Representative Entity under the same terms as the original offer.

3) If the Company chooses not to accept, the Representative's Sponsor will be given the opportunity to make an offer or find a purchaser, under the original terms, within a 30-day period.

4) Company approval of a proposed sale must be in writing.

5) All transactions must maintain the integrity of the organizational genealogy.

6) A $100.00 Sale/Transfer Fee will apply.

K) Divorce:

1)    Should a marriage or common-law partnership dissolve, the parties must notify the Company in writing (signed by both parties) as to how the Representative position is to be managed.

2)    Until notification, commission checks and bonuses will be payable in accordance with the current Representative Application & Agreement on file.

L)   Beneficiaries:

1)    Upon death or incapacity, the benefits of this Agreement shall inure to the Representative's heirs or successors in interest and the obligations and benefits of this P&P shall be binding upon the respective successors, upon completion of a new Representative Application and Agreement.

2)    In the event of death, the designated beneficiary shall provide the Company with a certified copy of the final will and testament (or probate decision in absence of a will), if any, along with a certified copy of the Death Certificate.

3)    In the event of an extended probate, the legal representatives of the deceased Representative should contact the Company to discuss how to proceed. In the absence of any instructions, all communications and payments will be made in accordance with the original Application.

M)   Sponsoring Rights and Responsibilities:

1)    Representatives have the right to sponsor others within authorized territories.

2)    Sponsors must fulfill the obligation of performing bona fide supervisory and training functions in the marketing of products and program benefits.

3)    Sponsors must not make exaggerated claims of financial rewards during marketing presentation.
    (a)  If any income claims are made, each prospect must be provided with the current Organo Gold Compensation Summary, which is available in the Representative Back Office.

4)    Representatives are compensated solely for the sale of products sold by them and their downline organization. The mere act of sponsoring a new Representative does not generate any compensation whatsoever.

5)    The ultimate purpose of the Organo Gold business is the sale of products to end consumers; this must be emphasized in all opportunity presentations.

N)   International Representative Status:

1)    Representatives interested in participating in other international Organo Gold ventures should contact their local office to obtain instructions.

2)    **Representatives may only conduct business in countries where the Company is currently authorized to conduct business. This includes prospecting, lead generation, and sales of product. In addition, due to differing requirements in labeling and compliance from country to country product originating in one country may only be sold or delivered within that country. In order to protect the integrity of the Company as well as the organization, violations of this policy will not be tolerated.**

3)    Legal requirements differ for each country, so Representatives should not assume that Representative Status requirements are the same worldwide.

4)    Representatives are subject to the policies and procedures set forth by the Company in each country.

5)    Representatives must utilize only authorized distribution channels to build their marketing organizations.

O)   New Market Development:

1)    Representatives may not individually import, export or distribute products or business building tools in any country.

2)    The Company has the sole responsibility of contacting and coordinating with government or legal agencies for the purpose of initiating the approval process to introduce Organo Gold products to any country. Notwithstanding the Representative's enthusiasm and good intentions, circumvention of this policy could have harmful effects on the Company's ability to conduct business. Therefore, attempts to market in countries outside of officially open Organo Gold's official list will result in sanctions, up to and including immediate termination of the Representative's status.

3)    Representatives understand that conducting any pre-launch activity in countries not officially open for Organo Gold business is against Company policy and may be illegal in some countries.

4)    Violators of this policy shall be subject to the laws governing that country, termination of their Representative Status and subject to civil and/or criminal prosecution to recuperate any damages to the Company.

P)   Orphans:

1)    Orders will not be accepted from anyone who does not have a Sponsor.

    2) If the Company receives inquiries from the public about its products and opportunity, it will attempt to ascertain whether contact resulted from a Representative's sponsoring efforts and if so, the inquiring party will be referred to that Representative.

    3) Other prospects, who have simply heard of the Company without any discoverable contact with a Representative, will be referred to an Active Representative pursuant to the Company's lead distribution policy.

Q) Yearly Account Administration Fees:

    1) An automatic yearly account administration fee will apply on the Representative's anniversary date.

R) Voluntary Cancellation:

    1) Representatives may cancel their Representative status at any time with a signed and dated letter indicating their intent to discontinue their Status.

    2) Any Downline organization affected by the resignation shall be transferred to the resigning Representative's Enrollment Sponsor.

    3) Once an account has been cancelled, the former Representative may not re-apply for Representative Status, either as an individual, sole proprietor, partnership, corporation or member of a cooperative for six months from the date of cancellation, provided he or she was in good standing at the time of voluntary cancellation.

S) Involuntary Termination:

    1) The Company may terminate a Representative immediately and without notice if any provision of this P&P or other Agreements is violated.

    2) The Company may terminate a Representative for any reason whatsoever upon 30 days notice to said Representative.

## VII.  COMPANY PRODUCTS & SERVICES

The Company opportunity is built upon retail sales to the ultimate consumer. The Company recognizes that Representatives may wish to purchase products in reasonable amounts for their own personal use; such sales are recognized as bona fide retail sales. However, **Representatives must certify that over 70% of previously purchased products have been sold or consumed before further products can be ordered (this is commonly referred to as the 70% Rule).** Representatives may be asked at any time to verify and certify said retail sales. The Company reserves the right not to sell product to a Representative if verification cannot be confirmed.

A) Ordering:

    1) The Company will accept orders for products and services from Representatives only when a valid Representative Application is on file.

    2) When submitting orders to the Company, Representatives must use official order forms that may be downloaded from the Company website or purchased from the Company.

    **3)** Orders are accepted via telephone, facsimile, mail or the Representative section of the Company website. **It is the sole responsibility of the Representative to verify receipt of the order and to ensure that the order is received in time to meet the deadlines for weekly and monthly commission periods.**

    4) Initial orders may not be in excess of $2,500. Subsequent orders will be subject to verification of the 70% Rule.

    5) Unless otherwise indicated, products and services are processed at Representative wholesale prices.

    6) The Company has established a Suggested Retail Price (SRP) as a recommendation for selling a particular product or service to retail customers.

    7) Sales taxes will be assessed on the purchase price of the products and services, in accordance with the relevant IRS and/or state tax regulations.

    8) The order must be accompanied by authorized payment covering the order amount, shipping, handling and tax.

    9) Separate payment must be included for each order submitted.

    10) Accepted payment methods are noted on the Order Forms.

    11) Multiple Representatives cannot combine two or more orders on the same form.

    12) Orders are credited to the commission period in which they are received, provided that proper payment is also received.

    13) For an order to be credited to a given commission period, it must be COMPLETED: 1) if by mail, phone or fax – by the end of the last working day prior to the commission period deadline (generally, for weekly commissions 5:00 pm Pacific on Friday (unless a holiday); or 2) online via back office or corporate website - 11:59:59 p.m. Pacific on the final day of the commission period. In the event of disagreement, the Company's timepieces will prevail.

14) The Company will correct any charge errors reported within 15 days, but will not be responsible for any errors or omissions not reported within 15 days.
15) Once an Order is placed it cannot be cancelled. The Representative or Business Entity can go through the return or exchange policies and procedures as outlined in the policies and procedures under sections VII. H and I. Customers must call support for instructions.
16) By reference, the provisions on the Order Form are incorporated into this Agreement.

B) AutoShip:

1) For convenience, the Company offers an AutoShip program to assist Representatives in managing their inventory.
2) Representatives may enroll in the AutoShip Program by submitting a signed and completed AutoShip Agreement to the Company.
3) Representative AutoShip orders are processed on the 1st or 15th day of each month and, subject to processing volume, Representatives will be allowed to specify one of the above process dates.
4) AutoShip orders may be modified on a periodic basis. **If a request for modification or cancellation is received less than five business days prior to the scheduled shipment, the changes will become effective the following month.**
5) The Company reserves the right to levy an $18.00 fee for cancellation of an authorized AutoShip commitment.
6) By reference, the AutoShip Agreement is incorporated into this P&P.

C) Preferred Customer e-Commerce Program:

1) The Preferred Customer programs have been designed to be a convenience for the Representative to easily reach and service their retail customer base.
2) The primary relationship in these transactions is between the Representative and their customer. Organo Gold fulfills a third-party merchant and fulfillment service role only.
3) Representatives will operate their Preferred Customer business in accordance with all the rules, regulations, policies, and procedures set forth by the Company.
4) In the event of a retail or preferred customer dispute, resolution is the responsibility of the selling Representative. The Company may step in as a third-party intermediary in the case of non-resolution.
5) Representatives agree that if within 30 days of purchasing product directly from the Company the Preferred Customer is not satisfied with the results for any reason, the Preferred Customer may contact the Company for an exchange or refund on the purchase amount of the product(s) and any applicable taxes (Shipping and Handling charges excluded).
6) Representatives are responsible for paying the Company the expenses of a Preferred Customer product return or credit card chargeback. Should the Preferred Customer initiate a product return or a credit card chargeback, the Representative agrees that the Company may debit from the Representative's commission check all reasonable expenses incurred and commission or incentives paid on the returned products.
7) Representatives acknowledge that the Company reserves the right to discontinue service to a Preferred Customer if the Preferred Customer returns more than 50% of total purchases over any six-month period.
8) The Preferred Customer return policy, as listed on the Preferred Customer Product Order Form and the Preferred Customer Auto-Replenishment Agreement & Order Form applies only to products that Preferred Customers purchase directly from the Company.
9) The Company provides merchant services and acts as a fulfillment house on the Representative's behalf. By submitting a Preferred Customer Product Order Form and the Preferred Customer Auto-Replenishment Agreement and Order Form, the Representative authorizes the Company to deduct a 3.5% merchant account transaction fee for each Preferred Customer order placed under the Representative's number.
10) Representatives are entitled to cancel their participation in the Preferred Customer e-Commerce Program at any time and for any reason upon written notice to the Company.
11) By reference, the Preferred Customer Product Order Form and the Preferred Customer Auto-Replenishment Agreement and Order Form are incorporated into this P&P.

D) Non-payment:

1) The Company reserves the right to levy a $42.00 service charge for non-payment of EFT accounts or credit cards supplied as a form of payment for product and services, be it a one-time order or an AutoShip order.
2) A second non-payment incident shall result in a $60.00 service charge and suspension of ordering privileges by credit card or EFT.
3) At the Company's discretion, commission checks may be withheld until the issue is resolved.

E) Representative/Company Employee Relations:

( Organo Gold Policies & Procedures – USA )  11/20

1) In order to protect the rights of Representatives and Organo Gold employees alike, all calls may be recorded for training and compliance purposes.
2) Company employees are trained to be courteous and professional in all contact with Representatives and the public.
    (a) Should a Representative ever receive less than respectful treatment from Company personnel, they should document the situation and forward it to the Compliance Department for immediate review.
3) Representatives are expected to extend these same courtesies when dealing with corporate staff, via telephone, Internet, or in person.
    (a) Company employees are not expected to endure abusive behavior from Representatives; in the event an employee feels that this is occurring, they are instructed to politely end the conversation, document the incident, and report it to a supervisor.
    (b) Documentation will be forwarded to the appropriate executive officer for review.
    (c) In severe circumstances, offending Representatives may be subject to immediate termination.
4) Representatives wishing to give small tokens of appreciation to be shared by an entire department should first notify and receive authorization from the department executive.
5) To avoid any conflict of interests, Representatives may not sponsor Company employees into the program. Such attempts may be viewed as hostile and may result in termination of the Representative and/or the employee.

F) Shipping and Handling:

1) The company will ship product orders to the street address specified by the Representative.
2) In the event a P.O. Box, General Delivery, or other delivery mechanisms are used at the request of the Representative (e.g. leaving the package in a designated area without live receipt), the Company assumes no responsibility for lost or missing packages.
3) Representatives are solely responsible for notifying the company, in writing, of any change in their address or personal information (name or marital status).
4) If delivery is unsuccessful due to outdated or incomplete address information, the original shipping charges will be recovered from the Representative and additional charges will be levied for reshipping the product.
5) Orders received and processed Monday through Friday prior to 10:00 a.m. Pacific will normally be shipped the same day.
6) Orders received and processed after 10:00 a.m. Pacific or over the weekend will be shipped the next business day.
7) Orders received on a holiday will be processed and shipped the next business day.
8) The company has no minimum order restrictions, although minimum shipping charges may apply.
9) All orders are shipped ground service via the carrier under contract with the Company, unless expedited or alternate service (overnight, 3 day delivery) is requested at the time of ordering. Expedited services will incur additional handling fees and freight charges.
10) Shipping charges are subject to market variables, so Representatives should consult the current price list or the Representative section of the corporate website for freight updates.
11) Representatives should report any order shortages or errors to the company within 10 calendar days of receipt.
12) In the event a shipment is damaged in transit, the Representative should refuse the package and immediately contact the Company.
13) When concerned that an order is lost, the Representative should wait a minimum of seven business days before requesting assistance or replacement. Package tracking information is available through the corporate website.
14) Orders may be delayed or not processed if information is illegible or incomplete, or insufficient payment was enclosed. The Company is not responsible for any delays caused; neither is the Company responsible for notification of said delay. All orders must be sent in properly completed with appropriate payment attached.
15) The Company will not be responsible for shipping delays caused by circumstances beyond its control.

G) Out of stock items:

1) If any products are temporarily out of stock, the Representative will receive notification of the back-order at the time of the order or on the invoice.
2) Back-ordered product is paid for when ordered and commissionable volume is accrued for the corresponding commission period.
3) Back-orders are always filled first and will be shipped at no additional charge.

H) Representative Product Exchanges:

1) Representatives may exchange products within 45 days of the invoice date if the products are unopened, undamaged and in resalable condition.
2) To exchange a product, the Representative must:

    (a)  Call Representative Services,
    (b)  notify them of the product(s) being exchanged,
    (c)  provide them with the original invoice number,
    (d)  receive a Return Merchandise Authorization (RMA) number, and
    (e)  place and pay any difference for an order for exchange products; the total must be equal to or greater than the products being returned, excluding shipping and taxes. Appropriate shipping charges and taxes will also be charged. No credit will be allowed towards future purchases.
    (f)  Each package must have the RMA number clearly printed in indelible ink or the package will not accepted by the Company.
    (g)  The Representative is responsible for all shipping costs related to the returned items and for the exchange items to be sent.

I)    Refund Policy:

  1)  Products, Sales aids & Business Kits that are unused, unopened and resalable may be returned for refund within 30 calendar days of the invoice date with no affect on Representative Status, except insofar as said returned volume may affect PV and/or GV for paid rank qualifications. The invoiced amount will be refunded, minus shipping and handling, to the Representative in the same form as the original payment was submitted.

  2)  Products, Sales aids & Business Kits: that are unused, unopened and resalable may be returned in conjunction with the cancellation or termination of a Representative Status within 60 calendar days of invoice date with no affect on Representative Status, except insofar as said returned volume may affect PV and/or GV for paid rank qualifications. The invoiced amount (less 10% restocking fees, appropriate set-offs, which includes shipping and handling), will be refunded to the former Representative in the same form as the original payment was submitted.

    (a)  In the event that products are returned in conjunction with the voluntary cancellation of the Representative Status, the Representative will be ineligible to participate actively or passively in the Organo Gold Compensation Plan for a period of at least six months, See section VI.H.5 above notwithstanding.

    (b)  **Montana Residents Only**: - Montana residents may cancel their Representative Agreement and return their Business Kit for a full refund within 15 days from the date of enrollment.

  3)  **Beyond these two dates, along with the 45 day exchange policy, Organo Gold will not accept any returns for products.**

J)    Representative Retail Sales:

  1)  Products are provided to Representatives at wholesale prices and may be retailed to customers at a competitive price.

  2)  Representatives must provide all retail customers with a Retail Sales Receipt at the time of the sale that specifies the total amount the customer will be required to pay and the contact information for the Representative.

  3)  Representatives are required to offer retail customers a 30 day 100% money back guarantee.

  4)  If within 30 days of purchasing and using a product a customer is not satisfied with the results, they must notify the Representative who sold them the product for a refund on the purchase amount and any applicable taxes upon return of the unused portion of the product to the Representative.

  5)  The Representative may keep the returned product for their personal inventory or contact the Company within 45 days of the original purchase date to initiate a product exchange. Product exchanges will be subject to section VII.H above.

  6)  The Company will not honor returns exceeding 45 days from the original date of purchase, whether the product is sealed or opened.

K)    Product Liability:

  1)  The Company has product liability insurance, which covers claims arising from the use of the products in accordance with the label.

  2)  Product tampering, is strictly forbidden by state, provincial, and federal laws, and completely nullifies the liability insurance.

  3)  Representatives who tamper with products become personally liable and are subject to immediate termination, as well as criminal and/or civil legal consequences.

## VIII.  COMPENSATION

A)    The Organo Gold Compensation Plan is based on a Network Marketing system of person-to-person distribution and direct sales. Representatives are compensated for the products sold and distributed through their sales and marketing organizations.

Compensation is based on rank differential percentages, generational and revenue sharing bonuses, and incentives. By reference, the Organo Gold Compensation Plan is incorporated into this P&P.

B) Qualifications & Accounting Fees:

1) Representatives must meet the published PV and GV requirements to qualify for commissions, rank advancements and incentives.
2) Commissions are not paid on the purchase of any promotional business material such as sales aids.
3) Monthly commission checks are distributed via postal carrier on the 20th day of the month (or nearest succeeding business day) following every commission period.
4) Weekly commission checks are distributed via postal carrier.
5) If a Representative finds any commission discrepancies, these must be reported to the Commissions Department within 15 days of receipt of the commissions check for adjustments to be made.
6) All commission and bonus checks must be cashed within six (6) months or they become void.
7) **In cashing any commission or bonus check, the Representative reaffirms his or her commitment to abide by this P&P, as may be amended from time to time.**
8) Checks will be processed for amounts equal to or exceeding $7.00. If a Representative's net earnings do not equal or exceed this amount, the commissions will be accrued until they reach the minimum amount for a check to be issued.
9) In order to become eligible for the Global Business Pool commission check, Representatives must have posted an Organo Gold live event prior to becoming eligible for the Global Business Pool compensation.

C) Commission Check Fees:

1) Monthly accounting fees covering currency conversions, general account and organizational tree maintenance may be deducted from the Representative's commission checks.
2) The Company may debit or place a hold on any commission checks for any amount owed it by the Representative.
3) The Company will issue replacement checks for any lost or destroyed checks that are reported within 15 business days after the date of issue. A stop payment and processing fee of $36.00 will apply.

## IX. RESTRICTIONS

A) The Company has a fiduciary obligation to protect and safeguard Representatives who have placed their trust and confidence in the Company mission and management. In conducting their business, Representatives should endeavor to promote the reputation of the products and services of the Company, and refrain from all conduct that might be harmful and inconsistent with the greater public interest of Organo Gold.  By reference, any compliance updates distributed by the Company are automatically incorporated into this Agreement.

B) Representations: Representatives…

1) shall truthfully and fairly represent the Company, its products, and programs in discussions with current or prospective Representatives.
2) may not enter into a contract or transaction on behalf of the Company or represent themselves as employees, representatives, agents or preferred vendors of the Company.
3) may not make any claims as to any therapeutic or curative properties of the Company's products. The Company's products are not intended to diagnose, treat, cure, mitigate, or prevent any disease and should never be offered as such.
4) shall not suggest any diagnosis, prognosis, evaluation, treatment, description, management or remedy of illness, ailment or disease.
5) may not make any false, unreasonable, misleading, or intentionally misrepresenting income projections to prospective or current Representatives. Any income projections must include a compensation summary, which is issued periodically by the Company. Said summary must be given out to each prospect at the time that such projections are made, and may be downloaded from the Representative back office.
6) will stress that success within the Company's marketing program depends on personal efforts and will vary from Representative to Representative.
7) may not claim that the Company's plan or product portfolio has been approved or endorsed by any governmental agency.
8) are fully responsible for any verbal or written statements they make regarding the Company, its products, services, and opportunity, which are not in compliance with the current, official Company sales support material.

C) Advertising:

1) Organo Gold compensates its Representatives for marketing products person to person. This may be done in a retail environment where personal services are provided for example, in barbershops, salons, and health clubs, so long as the products are not displayed in areas where other similar products are displayed.

2) The booth displays, advertisement or promotion of Company products, services or business opportunity at fairs, trade shows, open-air markets or any similar events, requires prior written approval from the Company.

3) To protect person to person marketing efforts, the Company retains the discretion to restrict its products from being sold at any location which it does not deem acceptable.

4) Exterior signs or window displays advertising the Company or its products will not be permitted at any location.

5) Representatives may not use, reproduce or disseminate the Company trade name, logo or any trademark or service mark except those found in literature published and made available by the Company. This includes, but is not limited to, using the term "Organo Gold, Inc.," (or any derivative that may confuse someone into believing that they are dealing with the Company), the corporate logo, and all marks or slogans designating products or services offered by the Company.

6) **Vehicle Signs:** Except for pre-approved car decals/signs/clings that may be available from the Company, no Representative or Business entity may use the Company trade name, trademark, logotype, design, or symbol on any vehicle except by express prior written consent from the Company.

7) Representatives may use the "Independent Organo Gold Representative" logo developed for them by the Company on approved business cards, letterhead, vehicle signs, envelopes, websites and other advertising.

8) All Representative material should display the phrase "Independent Organo Gold Representative" in a prominent position, using the same font size, color, and type as the surrounding text.

9) Representatives agree to avoid any references or website links to any third party literature for the purpose of verifying or stressing any medicinal or therapeutic effects of any Company product or its components. By reference, these third party claims become direct claims without proper validation.

10) Representatives must avoid any false appeals to authorities (deities, doctors, nurses, therapists, scientists, officers of the company, etc.) when presenting the Company's products or opportunity.

11) Representatives may distribute any approved sales material only within their downline.

12) Representatives may not charge any for-profit fee for any services, trainings, literature, materials, websites, memberships, or other Company-related material.

13) To avoid a conflict of interest, Representatives will not sell, display, or advertise the Company's products in conjunction with similar non-Company products in any physical or electronic retail sites, displays, or advertisements.

14) The Company prohibits Representatives from promoting another competitor company's products along with the Company's products on any physical or electronic retail sites, displays, or advertisements. (Competitor company: is defined as another coffee beverage company).

15) **It is strictly prohibited for Representatives to advertise or display Organo Gold's products' in advertising material, whether in print, electronic, or other, below the suggested retail price.**

16) All advertisement approval requests must be submitted along with a hardcopy copy of the proposed material, prior to the material being published or distributed. These advertisements include, but are not limited to: literature, audio or video tapes, emails, displays, vehicle signs, bulletin boards, websites, internet communications, telephone messages, print ads, merchandise, etc. At its discretion, the Company may require a written approval.

17) If written approval is required, the Company will respond within 15 business days from the date of submission.

18) Mass-medium marketing is not supported by the Company, and any requests for such projects will be denied. Examples of this type of marketing include radio and television infomercials or commercials, and/or billboards.

19) The Company retains the right, at its sole discretion, to request the immediate removal of any and all non-compliant or offensive material used by Representatives to promote the Company's products or opportunity.

20) Violation of any of the above restrictions may result in instant suspension and/or termination pending an investigation (See XI. Disciplinary Measures).

D) Internet Advertising:

1) All general advertising policies apply to internet/electronic advertising.

2) The Company offers replicating retail websites on the Internet with pre-approved text and photos.

3) Representatives may create their own websites independent of the websites available from the Company, provided these have been approved by the Company's legal advisor.

   (a) To initiate the personal website approval process, a written request must be submitted to the Company, by mail, along with a printout of the entire website, including all links and artwork, and the required legal fee. Please contact the Compliance Department for fee requirements.

   (b) Once the request for approval is submitted, the Representative agrees that any changes to the site in the future must be authorized in writing by the Company.

   (c) Representatives are responsible for keeping their independent site current, including product, promotion, event and marketing information.

4)  Representatives will not promote or sell Company products in any auction or sale sites (including electronic, e.g. e-Bay, Yahoo, Craigslist).

5)  Representatives are not allowed to use the Trademark "Organo Gold" in their email address, domain name and application.

6)  Violation of any of the above restrictions may result in instant suspension and/or termination pending an investigation (See XI. Disciplinary Measures).

E)  Spamming:

1)  The Company maintains a zero-tolerance policy regarding any spamming activity by Representatives. Spamming is the sending of electronic or other messages in an attempt to force information upon others who have not specifically expressed a desire or granted an approval to receive said information, regardless of whether or not a signature is included in the message.

2)  Unsolicited Email:

Organo Gold does not permit Representatives to send unsolicited commercial emails unless such emails strictly comply with applicable laws and regulations including, without limitation, the federal CAN SPAM Act, and they have been approved by the Company prior to distribution. Any email sent by a Representative that promotes Organo Gold, the Organo Gold opportunity, or Organo Gold products and services must comply with the following:

(a)  There must be a notice in the email that advises the recipient that he or she may reply to the email, via the functioning return email address, to request that future email solicitations or correspondence not be sent to him or her (a functioning "opt-out" notice). There must be a functioning return email address to the sender.

(b)  The email must include the Representative's physical mailing address.

(c)  The email must clearly and conspicuously disclose that the message is an advertisement or solicitation.

(d)  The use of deceptive subject lines and/or false header information is prohibited.

(e)  All opt-out requests, whether received by email or regular mail, must be honored. If a Representative receives an opt-out request from a recipient of an email, the Representative must forward the opt-out request to the Company.

(f)  The Company may periodically send commercial emails on behalf of Representatives. By entering into the Representative Agreement, Representative agrees that the Company may send such emails and that the Representative's physical and email addresses will be included in such emails as outlined above. Representatives shall honor opt-out requests.

3)  Unsolicited Faxes:

(a)  Except as provided in this section, Representatives may not use or transmit unsolicited faxes or use an automatic telephone dialing system relative to the operation of their Organo Gold businesses.

(b)  The term "automatic telephone dialing system" means equipment, which has the capacity to: (a) store or produce telephone numbers to be called, using a random or sequential number generator; and (b) to dial such numbers.

(c)  The terms "unsolicited faxes" means the transmission via telephone facsimile of any material or information advertising or promoting Organo Gold, its products, its compensation plan or any other aspect of the company which is transmitted to any person, except that these terms do not include a fax: (a) to any person with that person's prior express invitation or permission; or (b) to any person with whom the Representative has an established business or personal relationship.

(d)  The term "established business or personal relationship" means a prior or existing relationship formed by a voluntary two way communication between a Representative and a person, on the basis of: (a) an inquiry, application, purchase or transaction by the person regarding products offered by such Representative; or (b) a personal or familial relationship, which relationship has not been previously terminated by either party.

4)  Telemarketing Techniques:

The Federal Trade Commission and the Federal Communications Commission in the United States and the Canadian Radio-Television & Telecommunications Commission (CRTC) in Canada each have laws that restrict telemarketing practices. Federal agencies (as well as a number of states/provinces) have "do not call" regulations as part of their telemarketing laws. Although Organo Gold does not consider Representatives to be "telemarketers" in the traditional sense of the word, these government regulations broadly, define the term "telemarketer" and "telemarketing" so that your inadvertent action of calling someone whose telephone number is listed on the federal "do not call" registry could cause you to violate the law. Moreover, these regulations must not be taken lightly, as they carry significant penalties (up to $11,000.00 per violation in the United States/$15,000 per violation in Canada).

Therefore, Representatives must not engage in telemarketing in the operation of their Organo Gold businesses. The term "telemarketing" means the placing of one or more telephone calls to an individual or entity to induce the purchase of an Organo Gold product or service, or to recruit them for the Organo Gold opportunity. "Cold calls" made to prospective customers or Representatives that promote either Organo Gold's products or services or the Organo Gold opportunity constitutes telemarketing and is prohibited. However, a telephone call(s) placed to a prospective customer or Representative (a "prospect") is permissible under the following situations:

   (a)  If the Representative has an established business relationship with the prospect. An "established business relationship" is a relationship between a Representative and a prospect based on the prospect's purchase, rental, or lease of goods or services from the Representative, or a financial transaction between the prospect and the Representative, within the eighteen (18) months immediately preceding the date of a telephone call to induce the prospect's purchase of a product or service.

   (b)  The prospect's personal inquiry or application regarding a product or service offered by the Representative, within the three (3) months immediately preceding the date of such a call.

   (c)  If the Representative receives written and signed permission from the prospect authorizing the Representative to call. The authorization must specify the telephone number(s) which the Representative is authorized to call.

   (d)  You may call family members, friends, and acquaintances. An "acquaintance" is someone with whom you have at least a recent first-hand relationship within the preceding three months. Bear in mind, however, that if you make a habit of "card collecting" with everyone you meet and subsequently call them, the FTC in the United States and the CRTC in Canada may consider this a form of telemarketing not subject to this exemption. Thus, if you engage in calling "acquaintances," you must make such calls on an occasional basis only and not make this a routine practice.

   (e)  In addition, Representatives shall not use automatic telephone dialing systems relative to the operation of their Organo Gold businesses. The term "automatic telephone dialing system" means equipment which has the capacity to: (a) store or produce telephone numbers to be called, using a random or sequential number generator; and (b) to dial such numbers.

F)  Media Inquiries:

   1)  It is the Company's policy that spokespersons from the corporate office handle all media inquiries (whether radio, television or print).

   2)  Representatives agree to refer all media inquiries to the Media Department at compliance@OrganoGold.com.

G)  Trademark, Proprietary Information, and Trade Secrets:

   1)  The Company's trademark is an important and valuable business asset. The trademark helps identify the Company's products worldwide and distinguish the products from those of its competitors. The Company must protect its trademark from misuse and infringement, or it can be lost. Each time a trademark or symbol is used improperly or is used by someone other than its owner, the value and importance of the trademark can be greatly diminished. Once a trademark is weakened or lost, it is impossible to regain its full value and importance. Therefore, the Company makes every effort to protect its trademark, its corporate logotype, and label designs, so that others cannot use them. The rules set forth below have been developed to maintain the integrity of the Company Trademark and to ensure that the Company's name and marks will be available exclusively for the Company's business.

   2)  **Permission Prior to Use Required:** The Company will not allow use of its trade name (company name), trademarks (product names), designs, or symbols by any person, including a Representative, without its prior permission. The Company will issue cease-and-desist orders to any persons using its trade name, trademarks, designs, and symbols without its permission and will, if necessary, follow with appropriate legal action for failure to comply with a cease-and-desist order. If the Company did not do this, Representatives would soon find the market flooded with the Company's products not produced by the Company or sold by its Representatives. Obviously, the Representatives would be greatly harmed by such unfair competition.

   3)  Representatives may not have the Trademark name "Organo Gold" in their domain name, email address and application name. Representatives found violating this section must transfer the Trademark name "Organo Gold" to the Company at its own expense.

   4)  Representative information including: names, addresses, email addresses and telephone numbers of other Representatives, are the Company's proprietary trade secret information.

   5)  Proprietary information is transmitted to the Representative in confidence and, but for this agreement of confidentiality and non-disclosure, the Company would not provide this information to the Representative.

   6)  Representatives agree not to disclose such information to any third party or use such information for non-Company purposes.

7) The Representative acknowledges that such proprietary information is of such character as to render it unique and that disclosure or use thereof in violation of this provision will result in irreparable damage to the Company and to independent Representative businesses.

8) The Company and its independent Representatives will be entitled to injunctive relief to prevent violation of this policy.

9) The Company prohibits current and former Representatives, either directly or through a third party, from promoting another company's business during Company-sponsored activity or any activity promoted as such.

10) The Company does prohibit Representatives from promoting another competitor company's products, along with the Company's products, on any physical or electronic retail sites, displays, or advertisements (Competitor company is defined as a ganoderma and/or healthier coffee beverage company).

11) Representatives are independent contractors, and the Company imposes no restrictions on any Representative's participation or sales activities in other businesses or programs, so long as it is not a competitor company, and does not conflict with their Organo Gold business (Competitor company is defined as a ganoderma and/or healthier coffee beverage company).

12) Representatives shall not recruit other Representatives for other business ventures (Crossline recruiting). This policy shall apply to all countries in which the Company officially operates and shall survive the cancellation of this Agreement.

13) Violation of the letter and/or spirit of the P&P constitutes voluntary resignation and cancellation of the Independent Representative Agreement, effective the date of the violation, and the forfeiture of all commissions payable for and after the calendar month in which the violation occurred.

14) Violations of this policy are especially detrimental to growth and sales, and the Company may seek and obtain damages for violations of this policy.

## X.  NON COMPETITION AGREEMENT

Any Representative that is terminated and/or cancels his or her Representative Status, shall not compete with the Company or any of its affiliates by soliciting existing customers of the Company in any healthy beverage business similar to the Company in a multi level marketing setting or its equivalent, for a period of three (3) years.

## XI.  DISCIPLINARY MEASURES

A) All of the policies in this P&P, which includes the Independent Representative Application & Agreement, and any other agreements entered into by and between the Company and the Representatives are material terms to the agreement between the Company and the Representatives. Any violation of the terms and conditions entered into by and between the Company and the Representatives or the P&P or any illegal, fraudulent, deceptive or unethical business conduct by a Representative may result, at the Company's discretion, in one or more of the following corrective measures:

B) Issuance of a written warning;

C) Imposition of a fine to be withheld from future commission or bonus checks;

D) Reassignment of all or part of their marketing organization;

E) Suspension of their Independent Representative agreement;

  1) Suspension means that the Representative will not be able to conduct any Company business until such time that the suspension has been lifted (No commission checks and no communication with his/her downline or upline). Any Representative found conducting Company business during a suspension will have their distributorship immediately terminated with the Company.

F) Termination of their Independent Representative agreement (Distributor forfeits all outstanding commission checks); and

G) Any other measure expressly stated within the policies set forth in the P&P.

## XII.  FOREIGN TRANSLATIONS

From time to time, the Company may make available foreign language translations of marketing, sales and policy materials. If discrepancies are found in wording, meaning, or interpretation between the English and foreign language translation, the English version will always prevail.

## XIII.  PRIVACY STATEMENT

A) Recently, privacy laws governing the restrictions on use of personal information have been considerably strengthened. To remain fully compliant with these laws and others that restrict how we collect and manage confidential information, we caution our Representatives to use every precaution when using telephone registration. As a company we have no way, via telephone, to validate an applicant's identity and verify that they understand the contractual obligations associated with being a Representative. Identity theft is illegal, and it is our policy to do everything possible to protect the security of those who choose to join Organo Gold.

B)   Further, Representatives acknowledge that they will receive or have access to "Personal Information" as defined in the Federal Personal Information Protection and Electronic Documents Act (Canada) and/or Personal Information subject to privacy legislation of one or more Canadian provincial jurisdictions (collectively "Privacy Legislation"). Representatives will hold such information separate and apart from any other information used or held by Representative and, undertakes to Company, that it will collect, use and/or disclose Personal Information only for the purposes authorized by Company with respect to the use and/or disclosure of Personal Information. Representative shall comply at all times with applicable Privacy Legislation and Representative shall promptly advise Company of any breach or suspect of breach of security protecting and Personal Information.

## XIV.   INDEMNITY

Each Representative shall hold the company harmless for any claims, damages, or liabilities arising from the Representative's misrepresentation, negligence or failure to follow the P&P. This provision will survive the cancellation of the Agreement.

## XV.   STATUTORY PRECEDENCE

The Company's P&P is subject to the prevailing territorial, provincial, or federal laws governing our industry.  These laws take precedence over any item included herein.

## XVI.   PROGRAM MODIFICATIONS

In order to maintain a viable business and to comply with governing laws and economic conditions, the Company has the sole right and discretion to modify its compensation plan, product line, pricing or P&P.  Such modifications shall be immediately binding upon notice to Representatives.  Updates shall be posted on the Company website. A hardcopy will be made available at the Representative's written request. Representatives agree to abide by any such modifications.

## XVII.   NON-WAIVER PROVISION

Failure by the Company to exercise any rights to the provisions stated in this P&P, Organo Gold Compensation Plan, Representative Application & Agreement, or any other document referenced herein, shall not constitute a waiver of the Company's right to demand exact compliance therewith. Waiver of this right by the Company can only be made effective by an authorized officer of the Company in writing.

## XVIII.   POLICY ENFORCEMENT

If any provision of the P&P is found to be invalid, illegal or unenforceable for any reason, the Company may amend or delete that provision. The amendment or deletion of any clause or provision, will not affect the remaining clauses and provisions, which will remain in full force and effect.

## XIX.   ARBITRATION

A)   Both the Representative and the Company hereby agree that their relationship is governed by this P&P.  Any claim, dispute or other difference shall be exclusively resolved by binding arbitration pursuant to the arbitration rules of due process in accordance with the Commercial Arbitration Act and/or Canadian Commercial Arbitration Center. Representatives waive their right to trial by jury or to any court. All arbitration proceedings shall be held in the City of Richmond, Province of British Columbia, unless the laws of the province or territory in which the Representative resides expressly require the application of its laws, in which case the arbitration shall be in accordance with those laws.

B)   Each party to the arbitration shall be responsible for its own costs and expenses of arbitration, including legal and filing fees. The decision of the arbitrator shall be final and binding on the parties and, if necessary, be reduced to a judgment in any court of competent jurisdiction. Nothing in this Agreement shall prevent the Company from applying to and obtaining from any court having jurisdiction, a writ of attachment, an injunction, or other relief available to safeguard and protect the Company's interest prior to, during, or following the filing of any arbitration or other proceeding or pending the rendition of a decision or award in connection with any arbitration or other proceeding. This agreement to arbitration shall survive any termination or expiration of the Agreement.

## XX.   GOVERNING LAW, JURSIDITION & VENUE

Jurisdiction and venue of any matter not subject to arbitration shall reside in the City of Richmond, Province of British Columbia, unless the laws of the province or territory in which the Representative resides expressly require the application of its laws, in which case that province or territory's laws shall govern with respect to jurisdiction and venue.

**XXI.  CONTACT INFORMATION**

| | |
|---|---|
| Telephone: | **1 – 877 – 674 – 2661** |
| Fax: | **(604) 288 - 5488** |
| Website: | **www.OrganoGold.com** |
| Email: | **support@Organogold.com** |
| Global Headquarters Mailing Address: | **4129 Almond Joy CT. Las Vegas, NV 89115** |

**© 2008 Organo Gold International, Inc.**

# Exhibit 12

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ORGANO GOLD INT'L, INC., a Nevada corporation, | |
| Plaintiff, | NO. _____ |
| v. | |
| LUIS VENTURA, an individual, LUZ ANGELA VENTURA, and individual; and L&A VENTURA MANAGEMENT, INC., a Texas Corporation. | |
| Defendants. | |

## SUPPLEMENTAL DECLARATION OF JOSELIN HIP ZELAYA

I, Joselin Hip Zelaya, having previously made a formal Declaration in this proceeding on 30 March, 2016 (the "First Declaration"), do hereby update that Declaration as follows:

1.      At paragraphs four (04) through seven (07) of the First Declaration, I describe how Luis Ventura's Distributorship Agreement was terminated on or about February 19, 2016.

2.      I can further confirm that I spoke directly with Mr. Ventura by phone on February 19th when he called me to inquire why his Distributor account was locked.

3.      Locking a Distributor out of their Account is a preventative measure undertaken by the Compliance Department while it investigates allegations of Distributor non-compliance with the Policies and Procedures.

4.      During this conversation I specifically confronted Mr. Ventura with respect to his actions of actively trying to solicit other Organo Distributors to leave Organo and join TLC. I openly asked to him to unequivocally confirm or deny the allegations of misconduct. I advised him this was his opportunity to be honest and to set the record straight.

5.      Mr. Ventura refused to either confirm or deny the allegations and demanded access to evidence in hands of Organo regarding the said activities in Las Vegas. I refused access to the evidence and demanded that he refrain from any further cross-recruiting activities.

6.      At paragraph nine (09) of the First Declaration, I describe the number of Complaints I received from Distributors concerning the wrongful actions of Mr. Ventura. Attached hereto is the updated Exhibit B to the First Declaration itemizing complaints by electronic communication.

7.      I have read and can affirm the Declaration of Norm Perrett, SVP International at Organo, dated March 28th; and can advise that since that date Organo has lost a further five (05) High Ranking Distributors, with a further 203 active Distributors in their respective business organizations expected to follow these Leaders to TLC shortly.

8.      This now brings the total Leaders lost to 31 with a cumulative loss of Distributors quickly approaching 3,000.

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this 11th day of April, 2016, at Vancouver, British Columbia, Canada

_____
Joselin Hip Zelaya

**EXHIBIT "B"**

**Other electronic reports received by Joselin Hip**

| | Name of Distributor: | Date of Report: | Nature of Report: |
|---|---|---|---|
| | John Sachtouras | Feb 25,2015 | 16 images of social media posts- Francisco Vasquez and Luis Ventura |
| 2. | John Sachtouras | Feb 25,2016 | Video of Francisco Vasquez having a confrontation with an OG distributor |
| 3. | John Sachtouras | Feb. 25,2016 | Screenshot of phone message from Luis Ventura – invitation to a web conference |
| 4. | Paola Ronderos | Feb. 25,2016 | Screenshot of WhatsApp message from Luis Ventura – invitation to a web conference |
| 5. | Paola Ronderos | Feb. 25,2016 | Screenshot of email received by Paola Ronderos. Luis Ventura inviting OG distributors to an event that he names exactly the same as an event that was being conducted by John Sachtouras |
| 6. | Gabriela Rodriguez | Feb. 25,2016 | Screenshot of phone log- Luis Ventura attempting to contact her |
| 7. | Gabriela Rodriguez | Feb. 25,2016 | Screenshot of WhatsApp message from Luis Ventura – invitation to a web conference |
| 8. | Gabriela Rodriguez | Feb. 25,2016 | Audio note recording - segment of the webinar hosted by Luis Ventura with Stormy Wellington |
| 9. | Rommel Morocho | Feb 26,2016 | Message from Rommel Morocho stating that he received a message from Luis Ventura inviting him to his teleconference. |
| 10 | Gloria Morocho | Feb 26,2016 | Message from Gloria Morocho stating that she received a message |

| | | | from Luis Ventura inviting her to his teleconference. |
|---|---|---|---|
| 11 | John Sachtouras | Feb. 26,2016 | Image of social media post-Francisco Vasquez and Luis Ventura |
| 12 | Victor Aponte | Feb. 26,2016 | Screenshot of Whatsapp conversation. – Victor Aponte confirms that Luis Ventura contacted him |
| 13 | Victor Aponte | Feb. 26,2016 | 4 audio files where Victor Aponte summarizes his call with Luis Ventura. Luis Ventura is discussing the new opportunity. |
| 14 | Erika Rojas | Feb 26,2016 | Summary of her conversation with Luis Ventura. Luis Ventura is discussing the new opportunity. |
| 15 | John Sachtouras | Feb 27,2016 | 4 images of social media post-Juan Wiedmann and Johanna Rivadeneira stating they will follow their leader Luis Ventura |
| 16 | John Sachtouras | Feb 27,2016 | 9 images of social media post-Francisco Vasquez and Luis Ventura |
| 17 | Yensi Talavera | Feb 27,2016 | Copy of messages sent to her by Luis Ventura |
| 18 | John Sachtouras | Feb 27,2016 | 5 images of social media post-Francisco Vasquez and Luis Ventura |
| 19 | John Sachtouras | Feb 27,2016 | Report that Natalia Tous was contacted by Luis Ventura. |
| 20 | Natalia Tous | Feb 28,2016 | Screenshots of whatsapp conversation where Luis Ventura contacts Natalia Tous. Inviting her to contact him if she is targeting an opportunity with certain income brackets (10,000 USD a month) |

| 21 | Carlos Carley | Feb 28,2016 | Audio file. He summarizes the call he received from Francisco Vasquez. He says Francisco is acting on behalf of Luis and other distributors that left to TLC. |
|----|---------------|-------------|--------------------------------------------------------------|
| 22 | John Sachtouras | March 1,2016 | Image of social media post- Francisco Vasquez and Ana Cantera. |
| 23 | Paola Ronderos | March 1,2016 | Screenshot of message where Brenda Sic resigns to OG |
| 24 | Paola Ronderos | March 1,2016 | Screenshot of message sent by Fernanda Vera promoting Luis Ventura and inviting people to contact her. |
| 25 | Fernando Rodriguez | March 1,2016 | Message where he is reporting that Jose Luna is contacting OG distributors in Long Island. Inviting them to start the business with Luis Ventura. |
| 26 | John Sachtouras | March 1,2016 | John Sactouras arrives to Bogota. Distributors are informing him that Luis Ventura and Francisco Vasquez claim that OG "will go down in Colombia in the next 90 days". |
| 27 | John Sachtouras | March 3,2016 | Screenshot of confrontational messages that Luis Ventura is sending to John Sachtouras. |
| 28 | John Sachtouras | March 3,2016 | Image of social media post- Johanna Rivadeneira promoting Luis Ventura |
| 29 | John Sachtouras | March 4,2016 | Screenshot of confrontational message that Luis Ventura sentto John Sachtouras. |
| 30 | Gilberto Perez | March 4,2016 | Report that his uplines are soliciting his active team in Chicago. His uplines are encouraging his organization to join Luis Ventura and Francisco |

| | | | Vasquez. |
|---|---|---|---|
| 31 | John Sachtouras | March 6,2016 | 17 historical messages showing Luis's past behavior. According to John he was showing lack of commitment to OG during at least the last 12 months. |
| 32 | Carlos Carley | March 6,2016 | Screenshot of messages sent by Juan Manuel Wiedmann. He was circulating information that he claimed he received from the Customer Service Manager in Colombia. He was making an unofficial/unauthorized announcement that the price of the OG packs had increased. |
| 33 | John Sachtouras | March 7,2016 | 6 images of social media posts-Luis Ventura |
| 34 | Hilda Degrandes | March 8,2016 | Screenshot of text message she received from Luis Ventura inviting her to a teleconference |
| 35 | John Sachtouras | March 8,2016 | Recording of message that Luis Ventura is sending to John Sachtouras. Luis is saying that he has recordings of John Sachtouras and he will upload them on social media unless he stops contacting people and asking them to submit evidence to Compliance. |
| 36 | Odile Perez | March 10,2016 | Audio file-recording of Julio Marmolejos inviting her to TLC. |
| 37 | John Sachtouras | March 10,2016 | Social Media posts of OG leaders now promoting Luis Ventura and TLC |
| 38 | Esther Hernandez | March 12,2016 | Report of the distraction and impact on Maryland. |
| 39 | Paola Ronderos | March 15,2016 | Report that Luis Ventura and his associates are calling the OG team inviting members to attend a meeting in Maryland. |

| 40 | Paola Ronderos | March 15,2016 | Video clip of a meeting that Luis Ventura is hosting. She recognizes her former downline members from New York. They all left to join Luis. |
| 41 | John Sachtouras | March 16,2016 | Social media post where an OG leader announces that he joins Luis Ventura. |
| 42 | Douglas Marquez | March 16,2016 | Report that Luis Ventura has been soliciting members of the Long Island team. |
| 43 | John Sachtouras | March 17,2016 | Audio file- Luis Ventura discredits the lawsuit. Says that it is not signed by Bernie, Shane or Holton. States that OG is shitting on itself because of the fear of all the distributors it is losing. |
| 44 | Rafael Cabrera | March 18,1016 | Screenshot of incoming call from Francisco Vasquez. Rafael provides summary of how Francisco was inviting him to join him in TLC under Luis Ventura. |
| 45 | Rafael Cabrera | March 18,2016 | Audio recording of Francisco Vasquez asking what was Rafael's feedback. |
| 46 | Gabriela Rodriguez | March 18,2016 | Screenshot of phone log showing missed calls from Luis Ventura |
| 47 | Gabriela Rodriguez | March 18,2016 | Audio recording of voice message that Luis Ventura left her- he asks for a call back. |
| 48 | Domingo Herrera | March 20,2016 | Short video showing the distributors (Jose Luna) that are now working with Julio Lama |
| 49 | Diego Cajigal | March 23,2016 | Audio note where he is reporting the situation in Colombia, Peru, Ecuador. |
| 50 | Diego Cajigal | March 23,2016 | List of 24 distributors that have left with Luis Ventura to TLC |

| 51 | Johns Sachtouras | March 25,2016 | Screenshot of the page http://www.elnuevocambio.com/ featuring the OG  diamond Johanna Morales |
| 52 | Paola Ronderos | March 25,2016 | 7 Screenshots of invitation sent by Johanna Morales to visit the page elnuevocambio.com Asks Paola to discuss this opportunity (TLC)with her husband. |
| 53 | Adriana Wilson | March 25,2016 | Screenshot of invitation sent by Johanna Morales to visit the page elnuevocambio.com |
| 54 | Ivan Tapia | March 27,2016 | Screenshot of social Media post featuring Johanna and an announcement that she has joined TLC |
| 55 | Domingo Herrera | March 27,2016 | Screenshot of the page http://www.elnuevocambio.com/ featuring the OG  diamond Johanna Morales |
| 56 | John Sachtouras | March 28,2016 | Screenshot of social media post where Ramiro Vasquez is promoting TLC, Francisco Vasquez, and Luis Ventura. John reports 2 more leaders that have joined TLC. |
| 57 | John Sachtouras | April 3,2016 | Screen capture – Alin Cabrera and Gonzalo Belloso (OG distributors) promoting Luis Ventura and TLC on Social Media. |
| 58 | Paula Ronderos | April 4,2016 | Report that Gerardo Gonzales has enrolled with Luis Ventura and is contacting the OG team in NJ. |

# Exhibit 13

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ORGANO GOLD INT'L, INC., a Washington corporation,<br><br>                    Plaintiff,<br><br>          v.<br><br>LUIS VENTURA, an individual, LUZ ANGELA VENTURA, and individual; and L&A VENTURA MANAGEMENT, INC., a Texas Corporation.<br><br>                    Defendants. | Civil Case No. |

## DECLARATION OF DOMINGO HERRERA

I, Domingo Herrera, declare:

    1.    I am over the age of eighteen years, am competent to provide to testify, and make the following statements based upon my personal, first-hand knowledge.

    2.    I am a currently authorized Distributor of Organo Gold ("Organo") in the United States, having entered into an Independent Distributor Agreement on July 1, 2010.

    3.    On February 17th, 2016, while attending the Organo Project 50K Event in Las Vegas, I received an invitation to attend a meeting at the hotel room of Luis Ventura at the Venetian hotel.

4.      When I arrived at the hotel room I was received by Luis Ventura and his girl-friend Fernanda Vera Salvatierra who advised me they were "contemplating" joining a competing MLM company -- Total Life Changes, LLC ("TLC").  Mr. Ventura stated that he was considering leaving Organo because his income had been steadily decreasing and the TLC opportunity offered a far more lucrative one than Organo. He had been considering TLC for a while now and had thoroughly investigated this new opportunity.

5.      Two days later, Friday February 19th, Mr. Ventura extended an invitation for me to return to hear more details about this "new" opportunity, along with others who he would be inviting to attend.

6.      I left feeling very uneasy at the suggestions made and the sneaky way Mr. Ventura was going around approaching other Organo distributors.  Immediately afterwards, I contacted a colleague of mine and fellow Organo Distributor, Mr. John Sachtouras, to advise him what had happened and seek some advice.

7.      Over the next couple of days I heard from other Distributors attending this Project 50K event, that they too had been subject to this "recruitment meeting" by Luis Ventura and one of his business partners, Mr. Francisco Vazquez.

8.      Subsequent to this, on 22 and 23 February, 2016, I received further text messages from Mr. Ventura advising me that he had been formally terminated by Organo, and inviting me to attend a conference-call / webinar he was hosting on February 24th, where he was going to present this same new business opportunity which he termed "El Nuevo Cambio" – *the new change*.  A translated copy of this messaging stream is appended as Exhibit A hereto.

9.      Since this time I have heard from a number of fellow Organo distributors that they had either been directly solicited by Mr. Ventura's group, or heard of the new opportunity from

other people who had been attended a conference call or had been approached by Mr. Ventura and his group.

10.     I am aware of the various social media links connected to Mr. Ventura's group and his "El Nuevo Cambio" project, and his on-going active solicitation of Organo distributors throughout the USA and Latin America.

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this _____ day of April, 2016, at _____

_____
Domingo Herrera

other people who had been attended a conference call or had been approached by Mr. Ventura and his group.

10.      I am aware of the various social media links connected to Mr. Ventura's group and his "El Nuevo Cambio" project, and his on-going active solicitation of Organo distributors throughout the USA and Latin America.

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this ___15___ day of April, 2016, at _____ Freeport, New York. _____

Domingo Herrera

EXHIBIT "A"

[Screen shot of Text Messages received by Domingo Herrera from Luis Ventura]



Estimados amigos y
Lideres,
Quiero comunicarles que
me despido de ORGANO.
Hoy han cancelado mi
cuenta.
Por los 2 últimos años he
luchado contra viento y
Marea por mantener el
negocio en Ecuador a
pesar de todo los
obstáculos que han
existido. Lo mismo hice
en Estados Unidos,
México, Colombia, Perú,
República Dominicana,
Puerto Rico, España,
Costa Rica. Grecia. Italia.

  

## EXHIBIT "A"

**[Screen shot of Text Messages received by Domingo Herrera from Luis Ventura]**



Puerto Rico, España,
Costa Rica, Grecia, Italia,
Africa y Asia.
Lo intenté todo, y es hora
emprender el vuelo en
busqueda de nuevas
historias !
Me despido con mucho
cariño y nos vemos en
las playas del mundo.
Atentamente,
Luis Ventura
+1-972-794-5475          6:21 PM

No solamente me han
cancelado a mi sino
también al Sr. Francisco
Vazquez Diamante Azul.

  

## EXHIBIT "A"

**[Screen shot of Text Messages received by Domingo Herrera from Luis Ventura]**



FEBRUARY 23, 2016

Hola amigos... Primero
decirle que los extraño
tanto y que realmente
aprendí, disfrute mucho
de la compañía de cada
uno de ustedes! La vida
es de ciclos, para mí la
gente es lo primero y eso
lo defenderé hasta la
muerte, yo sé que en este
momento hay mucha
necesidad con nuestra
gente por eso emprendo
un nuevo camino en
donde continuaré la obra
que inicie desde que vi

  

**EXHIBIT "A"**

**[Screen shot of Text Messages received by Domingo Herrera from Luis Ventura]**



que inicie desde que vi
que en esta industria se
podía ayudar a
personas.
Que Dios los bendiga y
nos vemos en las playas
de mundo!
Con amor Luis Ventura

12:15 PM

FEBRUARY 24, 2016

http://
elnuevocambio.com

6:56 PM



EXHIBIT "A"

[Screen shot of Text Messages received by Domingo Herrera from Luis Ventura]





6:57 PM

TODAY

Aquí esta el numero para la conferencia conéctate ya empieza en 10 minutos 857957115 código 252805#

7:47 PM

Si el Correcto es Este 8579571115

7:55 PM

  

**EXHIBIT "A"**

**[Screen shot of Text Messages received by Domingo Herrera from Luis Ventura]**



**EXHIBIT "A"**

**[Translation of preceding Screen shot of Text Message]**

["feather-pen" icon]   S Pen has been detached.

← [image: "circular photo"] **Luis Ventura**          [icons: "phone"; "paperclip"]   |

[MESSAGE BOX (white)]

Dear friends and Leaders,
I want to share with you that
they have let me go from ORGANO.

Today they cancelled my account.

For the past 2 years I have
fought against the current [breeze] and
Waves so as to maintain the
business in Ecuador,
notwithstanding all the
obstacles that existed. The same
which I did in the United States,
Mexico, Colombia, Peru,
The Dominican Republic,
Puerto Rico, Spain,
Costa Rica, Greece, Italy, [...]

 Type a message          ["Camera" Icon]

["Microphone" icon]

## EXHIBIT "A"

### [Translation of preceding Screen shot of Text Message]

[icons:
"continued"; "add'l contact"; "Facebook"; "add'l contact" …

"Bluetooth"; "silent"; "alarm"; "WiFi"; "signal strength"; 87% "battery charging"]          1:07 AM

← [image: "circular photo"]  **Luis Ventura**          [icons: "phone"; "paperclip"]   |

---

[FIRST MESSAGE BOX (white); … continued]

[…] Puerto Rico, Spain,
Costa Rica, Greece, Italy,
Africa and Asia.

I tried everything, and its time
To start the plane in search of
new stories !

I bid you farewell with lots of [all my]
affection [love] and we will see each
other on the beaches of the world.

Sincerely,
Luis Ventura
+1-972-794-5475

6:21 PM

---

[SECOND MESSAGE BOX (white)]

They haven't only terminated me but
also Mr. Francisco Vazquez Blue
Diamond.

6:30 PM

---

 |Type a message          ["camera" icon]          ["microphone" icon]

EXHIBIT "A"

**[Translation of preceding Screen shot of Text Message]**

[icons:
"continued"; "Facebook"; "Facebook"; "add'l contact"; "Facebook"; "add'l contact" ...
"Bluetooth"; "alarm"; "4G LTE (data)"; "signal strength"; 26% "battery life"]        8:09 PM

← [image: "circular photo"] **Luis Ventura**        [icons: "phone"; "paperclip"]  |

online

FEBRUARY 23, 2016

[MESSAGE BOX (white)]

Hello friends … First
Let me tell you that I miss [you all]
So much and that I really
learned [and]
enjoyed the company
of each of you!

Life is cyclical, [and] for me
people come first and this
I will defend until
I die[.] I know that at
this moment our people
are in great need[,] and
because of this I have undertaken
a new path[,]
one in which I will continue the work
I started since I [first] saw […]

 Type a message        ["camera" icon]

["microphone" icon]

**EXHIBIT "A"**

**[Translation of preceding Screen shot of Text Message]**

[icons:
"continued"; "add'l contact"; "Facebook"; "add'l contact"; ...

"Bluetooth"; "silent"; "alarm"; "WiFi"; "signal strength"; 87% "battery charging"]          1:08 AM

← [image: "circular photo"] **Luis Ventura**          [icons: "phone"; "paperclip"]  |

[FIRST MESSAGE BOX (white)]

[...] I started since I [first] saw
that in this industry
you could help people.

May God bless you [all]
and we will see each other
on the beaches of the world!

With love[,] Luis Ventura

                                        12:15 PM

FEBRUARY 24, 2016

[SECOND MESSAGE BOX (white)]

http://
elnuevocambio.com

                                        6:56 PM

[Web-site address; translated: "*the new change . com*"]

[THIRD MESSAGE BOX
(blurry photograph/picture of two people cut off at
heads) ... ]

 |Type a message          ["camera" icon]

                                        ["microphone" icon]

**EXHIBIT "A"**

**[Translation of preceding Screen shot of Text Message]**

[icons:
"continued"; "Facebook"; "Facebook"; "add'l contact"; "Facebook" ...

"Bluetooth"; "alarm"; "4G LTE (data)"; "signal strength"; 35% "battery life"]          7:58 PM

← [image: "circular photo"] **OG Luis Ventura ...**          [icons: "phone"; "paperclip"]   |
online

[...] 6:57 PM

[FIRST MESSAGE BOX
(white, partially hidden, continued from previous page)]

[SECOND MESSAGE BOX
(blurry photograph/picture of two people
holding a sign cut off at chest)]
                                                                6:57 PM

TODAY

[THIRD MESSAGE BOX (white)]

Here is the number for
the conference [call,] connect
right away[,] its starts in 10
minutes 857957115
code 252805#
                                                                7:47 PM

[THIRD MESSAGE BOX (white)]

Yes[,] the Correct one is This[:]
8579571115
                                                                7:55 PM

   Type a message          ["camera" icon]

["microphone" icon]

**EXHIBIT "A"**

**[Translation of preceding Screen shot of Text Message]**

[icons:
"continued"; "add'l contact"; "Facebook"; "add'l contact"; …

"Bluetooth"; "silent"; "alarm"; "WiFi"; "signal strength"; 87% "battery charging"]          1:09 AM

← [image: "circular photo"] **Luis Ventura**          [icons: "phone"; "paperclip"]   |

[FIRST MESSAGE BOX
(white, partially hidden, continuation of previous message)]
[…] minutes 857557115
code 252805#
                                                                    7:47 PM

[SECOND MESSAGE BOX (white)]
Yes[,] the Correct one is This[:]
8579571115
                                                                    7:55 PM

[THIRD MESSAGE BOX (white)]
For the people from other
Countries[,]
                                                                    8:01 PM

[FOURTH MESSAGE BOX (white)]
They can download the app […]
                                                                    8:01 PM

[FIFTH MESSAGE BOX
(image of a four step process on how to install an app
from: "FreeConferenceCall.com")]
                                                      8:01 PM

[SIXTH MESSAGE BOX (white)]
[By] Clicking here[:]
http://elnuevocambio.com
                                                                    9:57 PM

😊          Type a message                    ["camera" icon]      ["microphone" icon]